UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )
                            )
        v.                  )    Cr. No. 05-10096-JLT
                            )
JUDY E. COLLYMORE           )
                            )


**GOVERNMENT'S SENTENCING MEMORANDUM**

On October 3, 2005, Judy Collymore pled guilty to both charges against her in this matter.  Collymore admitted that on or about March 16, 2004 she unlawfully conspired to import, and imported cocaine, a Schedule II controlled substance, into the United States from Jamaica.  See Presentence Report ("PSR") at ¶7.  There is no plea agreement between Collymore and the government.

The PSR in this case was issued on January 26, 2006.  In it, the United States Probation Office concluded that Collymore has no prior criminal history, other than a Possession of a Class B Substance, Cocaine, in which she received a continued without a finding disposition.  PSR ¶48.  The PSR also determined that Collymore was responsible only for the cocaine that she carried at the time that she was arrested at Logan International Airport. PSR ¶32.  The PSR concluded that the total offense level was 23 with a guideline imprisonment range of 46 to 57 months.  PSR ¶¶33, 96.

Collymore's Sentencing Memorandum seeks departures under U.S.S.G. § 3B1.2(b) on the grounds that she played a minor role in the offense. The U.S. Probation Office did not award a departure for minor role. PSR ¶36. Collymore asserts that she has demonstrated extraordinary post-offense rehabilitation warranting a reduction. Collymore also contends that she is entitled to a further departure under the sentencing factors delineated in 18 U.S.C. § 3553. The government contends that the guideline imprisonment range should be 46-57 months. The government therefore addresses the availability of departures under U.S.S.G. § 3B1.2(b), extraordinary post-offense rehabilitation, and the defendant's contention a further departure is warranted based upon the sentencing factors.

**FACTUAL BACKGROUND**[1]

On March 16, 2004, Special Agent ("SA") Gary W. Stephan of the United States Immigration and Customs Enforcement ("ICE") received an anonymous voicemail message. The caller indicated that Judy Collymore was involved in transporting drugs from Jamaica into the United States. The caller further stated that Collymore lived in Brockton, Massachusetts and made regular trips to Jamaica to pick up drugs and bring them back into the U.S.

---

[1] The facts are derived from the reports of Customs officials and agents from the Bureau of Immigration and Customs and Enforcement.

The caller explained that Collymore was leaving for Jamaica that same day and would be flying back through Miami, Florida where the person that Collymore worked for importing drugs was located.

Upon receipt of the anonymous call, SA Stephan began investigating Collymore's activities. SA Stephan reviewed ICE databases that revealed that Collymore's prior travels and Customs/ICE questioning. SA Stephan determined that Collymore did in fact reside in Brockton and did leave for Jamaica on March 15, 2004. Collymore was scheduled to return to the U.S. on March 23, 2004. SA Stephan determined that Collymore made at least nine trips to Jamaica from the U.S. since September, 2002.

SA Stephan determined that upon arrival into the U.S. from Jamaica from such a trip in September, 2003, Collymore was interviewed by Customs inspectors. Collymore initially told inspectors that she traveled to Jamaica to visit sick relatives and a boyfriend. Later, she stated that she was having affairs with various married men, and that was the reason for the frequent trips to Jamaica.

SA Stephan posted an intelligence lookout for Collymore for her return flight from Jamaica.

Collymore returned to the U.S. from Jamaica on March 25, 2004 at approximately 10:30 p.m., when Flight 49 landed at Logan International Airport. Flight 49 originated in Montego Bay, Jamaica.

Collymore was a passenger on the flight and deboarded the plane along with the other passengers.  Collymore was initially questioned by immigration agents, and referred her to Customs for further examination. Collymore arrived at the Customs area at about 12:15 a.m. on March 26, 2004, and was questioned by Inpectors Mark Halpin and John Baum.

Collymore was questioned concerning her itinerary and purpose of travel, along with other areas.  Collymore appeared nervous during the interview.  She indicated that her employment consisted of the past four months at minimum wage.  Collymore had $19 in U.S. currency in her possession at the time.  She offered no valid explanation for how she could afford to pay for the frequent trips to Jamaica.  Moreover, Collymore provided inconsistent statements regarding how she paid for the tickets, her destination and means of travel from the airport to her home in Brockton.

Collymore also denied that she traveled through other airports, despite Customs records that demonstrated to the contrary.

Based on Collymore's interview and the other available information about her, Collymore was advised that inspectors believed she might be carrying drugs and was asked to consent to an x-ray.  At approximately 2:05 a.m., she signed the consent form authorizing the x-ray.

Collymore was thereafter transported to the emergency room at

Whidden Hospital in Everett, Massachusetts for an x-ray. Before the x-ray was administered, she called inspectors into the hospital room and admitted that she had swallowed approximately 135 pellets of cocaine while in Jamaica. An x-ray of Collymore's stomach confirmed that she had swallowed a large number of cylindrical objects. Before the x-ray was taken, however, Collymore began to pass the pellets she had swallowed. The contents of one of the pellets field tested positive for cocaine.

A total of 142 pellets were retrieved. The substance was sent to the Drug Enforcement Administration ("DEA") laboratory for testing. The substance inside of the pellets was tested and determined to be cocaine with a net weight of 945.2 grams. The DEA form 7 is attached as Exhibit 2.[2]

### I.    COLLYMORE'S REQUEST FOR A MITIGATING ROLE DEPARTURE UNDER § 3B1.2(b) SHOULD BE DENIED

Collymore claims that she is entitled to a two point decrease due to her role in the offense. The PSR awarded no such departure. PSR ¶36. Under the Sentencing Guidelines, a decrease of two points in the defendant's offense level is authorized if he was a minor participant in criminal activity, and four points if he was a minimal participant in the crime. The defendant

---

[2]    The DEA form 7 also indicates that the contents of some of the pellets was actually cocaine base with a net weight of 19.3 grams. This substance was not charged in either count of the indictment.

bears the burden of proving that she is entitled to a downward adjustment based upon her role in the offense. United States v. Gonzalez-Soberal, 109 F.3d 64, 73 (1st Cir. 1997); United States v. Ortiz, 966 F.2d 707, 717 (1st Cir. 1992).  The mere fact that Collymore was a drug courier does not automatically entitle her to a two or four level  mitigating role adjustment. United States v. Paz Uribe, 891 F.2d 396, 399 (1st Cir. 1989)("even if the court found that Paz was only a courier, he would not automatically be entitled to a reduction"). See also  United States v. Lopez-Gil, 965 F.2d 1124, 1131 (1st Cir. 1992)(same); United States v. Gonsalez-Soberal, 109 F.3d 64, 73 (1st Cir. 1997)(drug courier seeking role adjustment bears the burden of proof).  Role requests by couriers require examination of factors such as "the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." Id.; see also U.S.S.G. § 3B1.2, comment (background)(role adjustment determinations are "heavily dependent on" the particular facts).

　　The relevant First Circuit decisions reflect these general principles.  For example, the court has repeatedly affirmed sentences where district courts refused to give any mitigating role adjustment to a courier involved in a single drug transaction.  See United States v. Cepeda, 907 F.2d 11, 12 (1st

Cir. 1990) (affirming district court's refusal to give any mitigating role adjustment where defendant served as courier for one 15 gram heroin deal by delivering heroin and collecting payment); United States v. Torres, 960 F.2d 226, 229 (1st Cir. 1992)(affirming district court's refusal to give any mitigating role adjustment to defendant who collected money for drug transaction, received bag from drug courier, and handed bag containing drugs to undercover agent).  Similarly, the court has found two-level adjustments to be appropriate for defendants who played a supportive role in a single drug transaction.  See United States v. DiMarzo, 80 F.3d 656, 661-662 (1st Cir.) (rejecting claim that defendant who drove to scene of single drug transaction to act as a lookout was entitled to three or four-level adjustment under U.S.S.G. § 3B1.2); United States v. De La Cruz, 996 F.2d 1307, 1314-1315 (1st Cir.) (rejecting claim that defendant who drove a van in a caravan seeking to carry 240 kilograms of cocaine was entitled to more than a two-level decrease under U.S.S.G. § 3B1.2); United States v. Rodriguez Cortes, 949 F.2d 532, 546-547 (1st Cir. 1991)(rejecting claim that defendant who attempted to collect installment payment on 26 kilograms of cocaine was entitled to more than a two-level decrease under U.S.S.G. § 3B1.2).

    Couriers play important roles in importation cases involving large amounts of cocaine, such as the amount in this case, 945.2

grams.  E.g., United States v. Garcia, 920 F.2d 153, 155 (2nd Cir. 1990)("Couriers are indispensable to the smuggling and delivery of drugs and their proceeds").  Large scale importation matters are particularly inappropriate cases to consider minor role adjustments, much less minimal role adjustments.  The job of the courier in such transactions is more important than in virtually any other type of case.  It is the courier who may perform the most important function and without whom the crime simply would not occur.  It is the courier who has possession of the drugs for substantial periods of time without supervision or control of any kind.  Unlike other trafficking cases, international couriers put more effort into their crimes simply by the degree of planning required and are therefore far more culpable.  The amount of drugs involved here weighs against departure. E.g., United States v. Lui, 941 F.2d 844, 849 (9th Cir.1991)("[W]e have recognized that possession of a substantial amount of narcotics is grounds for refusing to grant a sentence reduction"); United States v. Mena-Robles, 4 F.3d 1026, 1038 (1st Cir. 1993)(affirming refusal to give minimal role adjustment where defendant guarded money and "amount of drugs involved was quite large").

Application of these principles compels the conclusion that no departure under section 3B1.2(b) is available to Collymore. Collymore argues that this is an unusual case because she is less

culpable than anyone else involved in the crime of importing cocaine. The defendant fails to take into account the numerous other likely participants that performed supportive tasks like arranging for transportation, acting as lookout and collecting payment.

The facts here are insufficient to justify a departure. Collymore carried a substantial amount of cocaine into this country and was likely expecting to be paid for her efforts. Moreover, Collymore made at least nine trips to Jamaica from the United States within an eighteen month period. PSR ¶13, and Probation Officer's Response to Objection #3. It certainly takes no great leap of faith to conclude that Collymore was a veteran of importing drugs at the time she was finally apprehended. This conduct does not merit a departure for minor role in the offense.

**II.   COLLYMORE IS NOT ENTITLED TO A SENTENCE REDUCTION BASED UPON EXTRAORDINARY POST-OFFENSE REHABILITATION**

Collymore contends that her involvement in court ordered drug treatment programs as a condition of her release from incarceration during the pendency of this case was extraordinary in nature. The PSR detailed Collymore's continuous testing positive for cocaine use during her pretrial release, including as recently as September 12, 2005. PSR, Probation Officer's Response to Objection #9. Indeed, the PSR quoted Janet Zimmerman of one of Collymore's treatment facilities as describing

Collymore as "defiant and argumentative".  Id.  Further, Collymore demonstrated her true colors by threatening the staff resulting in Zimmerman describing her as follows: "Judy Collymore has been repeatedly non-compliant with house rules, i.e.; not making mandatory meetings, behind on rent, ignoring restriction policy, being disruptive when not getting her way, *threatening to do bodily harm to management*, etc." Id. (emphasis added)

Collymore has been an addict for twenty years, and appears to continue succumbing to her addiction.  Her efforts at shining up her image in return for sentencing reductions are transparent.  Collymore's post-arrest rehabilitation efforts are unavailing, and certainly do not rise to a level warranting extraordinary consideration.

### III. COLLYMORE IS NOT ENTITLED TO A SENTENCE REDUCTION BASED UPON THE SENTENCING FACTORS IN §3553

Collymore raises a variety of claims that she contends are considerations justifying a reduced sentence under the sentencing factors delineated in 18 U.S.C. § 3553.  Her claims center upon additional points.  First, Collymore claims that specific deterrence of any future criminal conduct by her has been met and therefore extended incarceration is unnecessary.  Second, that general deterrence is met because Collymore will receive a sufficient punishment for the crime.  Lastly, Collymore claims that she is the primary caretaker for her 92 year old mother.

These claims lack merit.

The PSR did not conclude that any downward departures were warranted.  PSR ¶¶115-116, and Probation Officer's Response to Objections.  It indicates that Collymore is a unemployed, and has been since August, 2005 and has not file tax returns during the years 2001 to 2004.  PSR ¶¶115-116.  There is no evidence that Collymore will not again return to risking apprehension in order to obtain money to pay for her continuing drug problem, instead of seeking and obtaining legitimate employment to permit her to be a law abiding member of society.  A more lengthy term of imprisonment will serve to raise the risk to Collymore and deter her criminal conduct. See 18 U.S.C. §§ 3553(a)(2)(A), and (B).

Likewise, general deterrence of similarly situated persons is not satisfied by only a brief period of imprisonment for Collymore.  General deterrence is an important consideration in assessing an appropriate sentence. See 18 U.S.C. § 3553(a)(2)(B). The most effective method of protecting this country from other financially motivated persons from risking apprehension and importing large quantities of drugs is to punish those that are caught severely.  The message of general deterrence will resonate with couriers and other supportive members the organization if the price of apprehension is high.  Here, simply stated a minimal period of incarceration for being arrested with nearly one kilogram of cocaine is not sufficient to prevent future criminal

11

conduct.

Lastly, Collymore's reliance on duties caring for her mother to discount her sentence for her criminal conduct is unpersuasive. Moreover, the PSR determined that Collymore's mother actually resided in a public housing facility, and not with her. PSR ¶56, and Probation Officer's Response to Objection #9. Accordingly, Collymore was unlikely to have played a significant role in caring for her elderly mother, and never claimed to when interviewed by the probation officer.[3]

### III.   CONCLUSION

Collymore is not entitled to the departures that she seeks and she should be sentenced within the applicable guideline range in this case, 46-57 months.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN

                              United States Attorney

                    By:   S/ Glenn A. MacKinlay
                          GLENN A. MACKINLAY
                          Assistant U.S. Attorney

---

[3] Collymore told the Probation officer that she (Collymore) lived with her niece, and not with her mother.

CERTIFICATE OF SERVICE

    This is to certify that I have this day served a copy of the foregoing document by efiling it to counsel for Judy Collymore, Page Kelley, Esq.

                              <u>S/ Glenn A. MacKinlay</u>
                              GLENN A. MACKINLAY